DAVID H. SHERMAN AND MORILLO H. GILLETT, RESPONDENTS, v. THE INMAN STEAMSHIP COMPANY (LIMITED), APPELLANT.

*Company carrying passengers and freight in steamers — liability of, for property injured — when the liability is not taken away by the provisions of the bill of lading —Duty of the master of a steamer after its machinery has been disabled — when he should abandon the proposed voyage — evidence.*

The plaintiffs entered into a contract with the defendant, which was engaged in carrying freight and passengers for hire in steamers by regular trips between New York and Liverpool, by which they were entitled to ship meat in a space assigned to them, and in which they had constructed a refrigerator, paying therefor a certain sum for each cubical ton of the space so assigned to them. An agent was sent with the ship by the plaintiff, whose duty it was to care for and preserve the meat. The plaintiff shipped a quantity of beef and mutton in pursuance of the said contract, but the mutton was omitted from the terms of the bill of lading taken therefor.

*Held*, that the omission of the mutton from the bill of lading did not relieve the defendant from liability for a failure to safely carry and deliver it, as it was placed in the refrigerator under the authority of the contract made with the plaintiffs.

That the liability of the defendant for property intrusted to its care was substantially that of a common carrier.

By the terms of the bill of lading the defendant was exonerated from such loss as might result from the decay of the property.

*Held*, that the defendant was thereby relieved from such loss only as might be occasioned by the tendency of the property, in and of itself to decay, and not from such as might be occasioned by its own negligent acts or misconduct.

On April 21, 1877, the plaintiffs shipped a quantity of meat and mutton upon one of the defendant's steamers which left New York on that day for Liverpool. The ordinary time required for the voyage of such a vessel was from ten to eleven days, but to insure the preservation of the meat the plaintiff had furnished sufficient ice to last for a period of from fifteen to twenty days. On the twenty-third of April the propeller shaft of the vessel broke and prevented her from continuing the voyage by machinery. She was then distant 490 miles from New York, 200 miles from Halifax and 385 miles from Boston.

She was on the line of outgoing and incoming steamers and the wind was favorable for her return to New York. Evidence was given tending to show that the captain knew that it would take at least from twenty-two to twenty-three days to make the voyage across the ocean by sail, and that he was informed by the person in charge of the meat that it could not be preserved for that time. The captain testified that he believed it to be the safe and proper course for him to proceed with the voyage, as he feared the danger of the coast and the probability of a westerly wind. The ship proceeded under sail to Liverpool and arrived there after thirty-six days. Some days after the accident the refrigerator was opened by the captain's direction, a portion of the meat taken therefrom for the use of the ship and the remainder, which was decayed and spoiled, was thrown overboard.

In an action by the plaintiffs to recover the damages thereby sustained by them:

*Held,* that the jury were properly instructed that if they were satisfied that the captain was negligent, heedless, thoughtless or reckless in endeavoring to continue the voyage in the disabled condition of the steamer, the plaintiffs were entitled to recover; and that a verdict in their favor would not be disturbed.

That they were entitled to recover for the meat taken for the ship's use as well as for that thrown overboard.

The plaintiffs were required to pay the freight before the voyage was commenced.

*Held,* that they were entitled to recover the amount so paid.

Upon the trial the statement of the plaintiffs' agent to the master of the vessel concerning the state of the meat, and his inability to preserve it for such a period of time as would necessarily be required to complete the voyage to Liverpool under sail, was received.

*Held,* no error.

APPEAL from a judgment in favor of the plaintiffs, entered upon the verdict of a jury, and from an order denying a motion for a new trial made upon the minutes of the justice before whom the action was tried.

*Ashbel Green,* for the appellant.

*Ira D. Warren,* for the respondents.

DANIELS, J. :

The recovery in this action was for the value of a large quantity of fresh beef, and also a quantity of mutton, placed upon the defendant's steamer, the City of Brussels, at the city of New York, on or about the 21st day of April, 1877, to be carried for the plaintiffs and delivered at the city of Liverpool in England. The steamer left New York on the 21st day of April, 1877, and on the twenty-third of the same month, when she had proceeded for the

distance of about 490 miles upon her voyage, she broke her propeller shaft, and thereby became disabled from pursuing it by means of her machinery. From that point she proceeded to Liverpool by sail, but before her arrival there the meat, with the exception of 6,153 pounds consumed on board the steamer, became tainted and spoiled, and on that account it was thrown into the sea. It was objected upon the trial that the plaintiffs could not, under their complaint, recover for the meat which was fed to the passengers and crew of the steamer in addition to the value of that which, on account of its condition, was thrown overboard. But as the complaint contained a full statement of the plaintiffs' entire cause of action, including all the meat, and issue had been taken upon it by the answer, the court could not properly withdraw any portion of the case from the consideration of the jury. If the two causes of action were improperly united in the complaint, the mode of correcting that was by a demurrer, and as no objection was taken in that form, it was by the express provisions of the Code waived. (Code of Civil Pro., § 488, sub. 7; § 499.) At the time when the trial was brought on it was therefore too late to raise this objection, or to obtain any direction on the part of the court requiring an election by the plaintiffs for which of the demands made they would claim to recover in the case. (*Gillett* v. *Borden*, 6 Lans., 219.) So far as the pleadings were concerned, the whole case was properly before the court to be determined by a trial.

For the beef which was laden on the steamer a bill of lading was taken, but the mutton was omitted from its terms. That omission, however, created no obstacle in the way of the plaintiffs right to recover its value, for it was placed upon the steamer under an agreement made with the agent of the company, by which they were entitled to ship meat in the space assigned to them, and in which they had constructed a refrigerator. By the terms of the contract a certain sum was required to be paid to the defendant as a compensation for each cubical ton of the space assigned to the plaintiffs, and they were at liberty to fill it with such meat as they desired to have transported on board of the steamer. This mutton was placed in the refrigerator under the authority of the contract, and as it was put there for the sole and only purpose of being transported upon the steamer to the city of Liverpool for a compensa

tion. to be for that purpose paid by the plaintiffs, the obligation was imposed upon the defendant safely to carry and deliver it, although that was not specially repeated in the bill of lading itself.

By the terms of the bill of lading, the defendant was exonerated from such loss as might result from the decay of the property. That was a contingency which was excepted from the risks intended to be taken by the carrier, but in this respect the bill of lading was no broader than the general principles of law applicable to the duties and obligations of carriers properly for hire. (Angell on Carriers [5th ed.], § 210 ; *Clark* v. *Barnwell,* 12 How. [U. S.], 272 ; *Mynard* v. *Syracuse, etc., R. R. Co.,* 71 N. Y., 180, 188.) Substantially the same obligation in this respect was therefore imposed upon the defendant, whether the property was received under the bill of lading, or in compliance with the terms of the agreement originally made between the parties, and under which their business was generally carried on.

But while the defendant was by the terms of the bill of lading, and the well settled principles of law applicable to the case, relieved from liability for loss occasioned by the decay of the property, that result would not follow when such a condition might be developed by the fault or misconduct of the carrier itself. It was only for such decay as might result to the meat in its proper or lawful transportation, that the defendant could be relieved, either under the terms of the bill of lading, or the law applicable to the case. It was against the risk of the tendency of the property in and of itself to decay that the carrier was intended to be relieved from responsibility, and whether the voyage was longer or shorter, as long as it was rightly pursued, the loss from that tendency would necessarily fall upon the shipper. But if the property was carelessly, or improperly, subjected to the development of its natural tendency to decay, then the same result would not follow, for the loss in such an event would not be caused by the circumstances intended to be guarded against, either by the bill of lading or the law. Where a carrier negligently or recklessly exposes the property of the shipper to decay, the law will hold him or it accounta ble for the consequences when the same legal result would not follow if such exposure had been avoided. To relieve the carrier from responsibility the tendency of the property in and of itself to

decay must be the cause of its loss. When that is not the case, and it appears to have decayed in consequence of the misconduct of the carrier, there a liability will arise because that is in legal contemplation the cause of the loss of the property. (*Clark* v. *Barnwell, supra; Lamb* v. *Camden, etc., R. R. Co.,* 40 N. Y., 271; *Peck* v. *Weeks,* 34 Conn., 145; *Mynard* v. *Syracuse, etc., R. R. Co.,* 71 N. Y., 180; *King* v. *Shepherd,* 3 Story, 349; *Lamb* v. *Camden, etc., R. R. Co.,* 46 N. Y., 271.)

The steamer was engaged in carrying freight and passengers for hire by regular trips between the cities of New York and Liverpool, and even though her business was not so general as to render it strictly that of a common carrier, still within the limits to which it extended substantially the same liability was created for the transportation and delivery of the property. The persons engaged in her navigation were surely bound to observe great care and diligence for the safe transportation and final delivery of property laden on board the steamer. (*Wyckoff* v. *Queens Co. Ferry Co.,* 52 N. Y., 32, 34; *Citizens' Bank* v. *Nantucket Steamboat Co.,* 2 Story, 16; *Pope* v. *Nickerson,* 3 id., 465, 473.) Within the limits to which its business extended substantially the same duties were to be performed as those required to be observed by common carriers in the transportation and delivery of property intrusted to their care. And the fact that a particular space was assigned to the plaintiffs for the carriage of their property, and it was accompanied by a person to care for and endeavor to preserve it, in no manner interferes with the application of those principles. (*Mallory* v. *Tioga R. R. Co.,* 39 Barb., 488; affirmed, 32 How., 616.) Under the circumstances of this case, as they were presented, it was it is true for the plaintiffs to show that those duties resting upon the carrier had not been performed. But as the case was finally disposed of, it was by no means important that this principle should have been made the subject, either of further special comment or remark than they were, for the inquiry upon which the rights of the parties were to be determined was substantially submitted in that manner to the jury. Whether the loss of this property was caused by the culpable misconduct of the master of the steamer who had charge of her navigation was a matter to be determined, as all controverted inquiries of a similar nature are, by the jury. (*Storer* v.

*Gowen,* 18 Me., 174; *Witney* v. *Lee,* 8 Metc., 91, 93; Angell on Carriers [5th ed.], § 184.) This was a controverted fact in the case, and whether the evidence was sufficient to submit it to the decision of the jury is a point now requiring to be considered.

It was, of course, the expectation of the parties that this meat would be carried from New York to Liverpool upon the vessel as a steamer, but the fact that it was not would not be sufficient to render the defendant liable for its loss. For that purpose it was necessary that the proof should establish some culpable misconduct or mismanagement on the part of the master of the steamer. And the fact that he persisted, after the accident, in prosecuting the voyage by sail, is a circumstance relied upon as exhibiting the existence of such misconduct. To carry the meat an apartment, called a refrigerator, was constructed by the plaintiffs on board of the steamer, and after it was placed in the refrigerator, it could only be preserved during the voyage by reducing the temperature to such a point as would prevent it from decaying. This was done by means of tiers of pipes placed around the sides of the refrigerator box and in its center, through which a solution of salt and water, produced by ice, was driven. To supply this solution a large quantity of ice was taken upon the steamer. The ordinary time consumed by such a vessel, in proceeding from New York to Liverpool, was from ten to eleven days; but for the purpose of insuring the preservation of the meat, the plaintiffs supplied themselves with a quantity of ice sufficient for their use for a period of from fifteen to twenty days. At the time when the accident occurred to the steamer, it was shown by the testimony of the captain that he knew that it would take at least twenty-two or twenty-three days to make the voyage across the ocean by sail. He further testified that the agent accompanying the meat informed him that the ice would last twenty-one days, and that he himself knew when the ice was gone the meat must spoil. It was reasonably clear from this evidence, although the captain, in terms, stated that he did not know that the meat would spoil before the voyage would be completed, that such must have been the impression existing in his mind, and he was reasonably bound, therefore, to act in accordance with that understanding. This, too, was the only portion of the cargo liable to be injured by the delay in its transportation, and as that fact was known to the captain, he was

bound to carefully consider it in determining the proper course to be pursued by him. (*Tierney* v. *New York Central, etc., R. Co.*, 76 N. Y., 305.)

In addition to these circumstances indicating that it was highly probable that the captain knew the plaintiffs' property would be destroyed if he persisted in prosecuting the voyage, as he did, he was informed by the person in charge of it that it could not be preserved during the time required to navigate the ship for the distance of 2,000 miles to be traversed for the purpose of reaching Liverpool by the use of sails. When the shaft was broken the ship was on the line of outgoing and incoming steamers, and the wind was blowing from an easterly direction, which was favorable for her return to the city of New York. She was at the time distant 200 miles from Halifax, and 385 miles from the city of Boston. In her disabled condition, she also had her useless propeller wheel, twenty-one feet in diameter and weighing about fourteen tons, at her stern to retard her onward progress. Evidence was given by nautical witnesses acquainted with the navigation of this portion of the ocean, who seem to concur in their conviction that the ship could have properly returned to the city of New York, and that good seamanship required that to be done. On the part of the defendant other witnesses were examined, who agreed in their conclusions for reasons assigned by them that the captain was justified in proceeding under sail to the city of Liverpool, and his own testimony was to the effect that he himself, fearing the danger of the coast and the probability of a westerly wind arising, believed that to be the safe and proper course for him to take. But while his evidence was clear and direct upon this subject, as its force and effect was certainly to some extent impaired by his relation to the loss, and his conduct was drawn in controversy as a controlling feature of the defendant's liability, the jury were not bound to accept and act upon his statements. It was, on the contrary, for them to determine whether he was right in this evidence given by him, or whether he had negligently or recklessly proceeded upon the voyage when he might safely have returned again to the city of New York, and in that manner protected the plaintiffs against the loss of their property. (*Elwood* v. *Western Union Telegraph Company*, 45 N. Y., 549, 553, 554; *Roberts* v. *Gee*, 15 Barb., 449.)

After commencing a voyage of this description, it is the duty of the master, under ordinary circumstances, to proceed to the place of destination without delay or deviation from the usual course. But where the vessel or her machinery may be so disabled as to render that an improper thing to do, a deviation for the purpose of obtaining necessary repairs is always allowed to be made. The law upon this subject has been stated to be, that when in consequence of disaster or other exigencies the vessel cannot safely pursue the voyage, the master is not only justified in quitting the course and seeking the most convenient and suitable port for repairs and supplies, but it is his duty to seek such a port. (1 Phillips on Ins. [3d ed.], § 1019.) When a vessel suffers so much of an injury during her voyage that she cannot safely proceed to a port of discharge without repair the master is authorized to seek an intermediate port for that purpose, but as long as she can be expected by an intelligent and faithful master to pursue her voyage in safety, she will be entitled to do so. (*Motteux* v. *Governor and Company of London Assurance*, 1 Atkins, 545; *Notara* v. *Henderson*, L. R., 7 Q. B., 225, 237; *Turner* v. *Protection Ins. Co.*, 25 Me., 515.)

In the latter case this right and duty of the master was very fully and carefully considered, and it was there held that the safety of life must first employ the attention of the master. And as this steamer had 180 passengers on board of her at the time, and a crew consisting of another hundred persons, this was an exceedingly important subject for him to consider. After that the duty of preserving the property is to be regarded by the master, and it is for him to consider and determine whether either or both would be needlessly jeopardized by persisting in the prosecution of the voyage. Where the facts are such as to lead the master, as an experienced and intelligent navigator, to conclude that the vessel can safely be continued on her voyage, he will be protected in taking that course. (Id., 523, 524.)

This was assumed to be the law applicable to this part of the case at the time of the trial, and in that view it was submitted to the determination of the jury. The evidence which had been produced for their consideration rendered this a proper subject for inquiry on their part. Although the master testified that he did consider these circumstances, and after deliberating upon them con-

cluded that he could safely prosecute his voyage under sail, the circumstances in the case were such as very seriously to impair the force of the statements made by him. It was quite probably made to appear that the steamer could have safely returned to the city of New York, and if that course had been taken the plaintiff's property would not have been destroyed. It was still more probable from the facts within the master's knowledge that this property could never be delivered at Liverpool if the steamer was to be navigated there under sail. The jury therefore had the right from the facts which were proven to infer that the master knew that such was the result, and with that knowledge pursued his course, understanding that it would be attended with a loss of the plaintiff's property. It was of no inconsiderable value, being worth the sum of upwards of $25,000, and the obligation consequently resting upon him to secure its preservation, as far as that could properly be done, was one of no insignificant character. In view of the evidence supporting these and the other circumstances directly bearing upon the impropriety of continuing the voyage, and of that tending to show that the steamer could have safely returned to the city of New York, and that comparatively a short period of time was necessary for that purpose, the question whether the master acted in conformity with the convictions mentioned by him in the course of his testimony, or recklessly disregarded the plaintiff's interest, or carelessly omitted to consider the circumstances in the case, were matters which it was the sole province of the jury to determine. They had the witnesses before them, and were capable of inferring what was the probable truth of the case. It was submitted to them by the court in a manner by no means unfavorable to the defendant, for they were so restricted by the instructions given to them as to prevent them from returning a verdict in the plaintiffs' favor unless they were satisfied that the master was negligent, heedless, thoughtless or reckless in endeavoring to continue the voyage in the disabled condition in which the steamer was placed by the breaking of her shaft.. This proposition as well as the duty of the jury to render a verdict in favor of the defendant, if they believe the master acted in what he did under the dictates of his judgment, were repeated in such a manner as apparently to prevent the possibility of misunderstanding on the

part of the jury. And after they had been so enjoined upon them no error can be assigned in the case because of the omission of the court still further to impress the observance of the same duty. As the case was made to appear this subject was a mere question of fact. The jury could well determine it either way as they believed the truth to be, and there was no such decided preponderance of evidence against their verdict as would justify the court in setting it aside. If the meat was destroyed, as the jury must have found it to have been, by reason of the circumstance that the master continued the prosecution of his voyage, and in that manner exposed it to a peril which it otherwise would not have encountered, when reasonable care and attention upon his part should have dictated the return of the steamer for the purpose of repairing the injury to her machinery, then the defendant cannot be exonerated from liability for the loss of the property because of its natural or inherent tendency to decay. In that state of the case the cause of the loss as the law contemplates and regards it is the misconduct of the master, and for that the defendant could properly be held to be liable.

Other exceptions were contained in the bill of lading which were relied upon at the trial as sufficient to relieve the defendant from liability for this loss, but the terms in which they have been expressed cannot be so construed as to include what has been found to be the cause which produced the destruction of this property. These exceptions included the risk of the craft or hulk, transhipment, explosion, heat, or fire at sea or on shore, boilers, steam or machinery, or the consequences of damages or injury thereto, howsoever that might be caused; collisions, straining or other perils of the sea, rivers or navigation, whether arising from the negligence, default or error in judgment of the pilot, master, mariners, engineers or other persons in the service of the ship, or for whose acts the shipowner is liable, or otherwise howsoever. It is very clear from the facts appearing upon the trial that the property was neither injured nor destroyed by the breaking of the machinery, which was the only one of these perils encountered, for it was precisely in the same condition after that occurrence as it had been before it took place, and it remained so until the inability arose of further preserving it by reason of the fact that the ice which had been taken on board had become exhausted. Neither of these perils in

any manner produced injury to any part of the property in contro-
versy, and consequently the defendant cannot be excused under
either of such exceptions. At the trial the court held that the
defendant was not liable for any error of judgment on the part of
the master as to the course which it was best under the circum-
stances for him to pursue; and in what was said upon this subject
as liberal a rule was adopted as either the bill of lading or the law
of the case required to be presented to the jury.

Before the voyage was commenced the plaintiffs were required to
pay the freight, which the defendant might earn by the transporta-
tion and delivery of the property. This amounted to the sum of
$3,730.10, and as their property was not transported to, and deliv-
ered at Liverpool, they were held to be entitled to recover it back.
This instruction has been relied upon as erroneous, but under the
authorities it appears to have been properly given to the jury.
(*Mashiter* v. *Buller*, 1 Camp., 84; *Hathaway* v. *Sun Ins. Co.*, 8
Bosw., 33; *Western Transportation Co.* v. *Hoyt*, 69 N. Y., 230;
*Phelps* v. *Williamson*, 5 Sandf., 578.)

In the latter case the authorities relied upon by the defendant's
counsel as sustaining a different view of the law were considered
by the court, and distinguished in principle upon the effect and
meaning of particular clauses of the contracts then before the
courts. As the authorities stand, the exception taken to the ruling
made upon this subject is incapable of being sustained.

While the mutton was not mentioned in the bill of lading, the facts
of the case warrant the inference that it was put on board of the
ship under the authority of the contract made with the defendant's
agent. It was included in the freight, for that comprehended the
space occupied by it, and the defendant became obligated to trans-
port and deliver it, substantially as it was bound by the bill of
lading to carry and deliver the beef.

The meat which was taken from the refrigerator when the sup-
ply of ice was about to fail, also constituted a proper charge against
the defendant in the case. That was taken under the authority of
the captain and fed to the persons who were required to be sup-
ported on board the steamer. Both these items were properly
included in the verdict, and the exceptions now bringing them up
for consideration cannot be maintained.

Objections were taken upon the trial to the evidence given by the nautical witnesses, who were allowed to state what they deemed to have been proper in the navigation of the ship after the occurrence of the accident. Their evidence was received, and to that the defendant repeatedly excepted. With the exception of a single instance contained in the case, the question by which the answers of these witnesses were elicited, have not been inserted in the case, and in that particular instance the witness did not answer the question which was propounded to him. He was asked what he thought the captain ought to have done, and his answer was "I think I would come back." No application was made to strike out this answer either as improper or not responsive, and as it was not the information which was sought for by the question, the exception taken affords no support to the present appeal. The other exceptions were in form taken to the questions and answers propounded to and given by the witnesses. But as none of these questions have been inserted in the case it cannot be affirmed that the rulings made upon them were in any respect improper. The case consequently differs from that of *Ayres* v. *Water Commissioners* (22 Hun, 297). And that evidence of the nature of that obtained from these witnesses is proper in a case of this description has been settled by authority. (*Transportation Line* v. *Hope*, 95 U. S. Sup. Ct., 297; *Guiterman* v. *Liverpool, etc., Co.*, 83 N. Y., 358, 366.)

And the rule as it has been settled does not seem to have been transgressed by the answers allowed to be taken at the trial. If it was, it was formally so only, and that should have been corrected by a specific objection presenting that view.

What was stated by the plaintiffs' agent to the master of the vessel concerning the state of the meat, and his inability to preserve it for such a period of time as would necessarily be required to complete the voyage to Liverpool under sail, was properly received as evidence in the case. For, in this manner, the master was made aware of the existence of circumstances required to be considered by him for the purpose of properly concluding what should be done in the emergency that had arisen. The statements became so far interwoven in what appears to have transpired, as to render them part of the transaction itself, and as such they were proper for the consideration of the jury.

A witness was examined upon the trial who was a passenger upon the steamer and left her when she met the City of Richmond, another steamer employed in the same line. By his testimony it appeared that he returned on board of her to the city of New York, and again resumed his passage for Liverpool on her departure and arrived there before the City of Brussels, which consumed a period of thirty-six days, after the accident, in reaching her destination. This evidence was not improper for it had some tendency to show what might have been accomplished if this injured steamer had returned for repairs and again resumed the voyage she was endeavoring to make. It was a circumstance connected with the occurrence, which it was not improper should be allowed to appear in the case.

The points already considered indicate the disposition which should be made of this controversy. Other exceptions, it is true, were taken upon the discussion of the motion made to dismiss the complaint and to direct a verdict for the defendant, and to the charge of the court and the omission to charge certain requests made in behalf of the defendant, but it is not necessary to consider them, for the reason that those already examined control the litigation in such a manner as to require the verdict and the judgment to be sustained. No special attention, therefore, need be given to these exceptions which have been generally referred to. The judgment and the order should be affirmed.

Davis, P. J., and Brady, J., concurred.

Judgment and order affirmed.